In The
# United States Court of Appeals
### For The Eighth Circuit

## LANEY MARIE GRINER; SAM GRINER

*Plaintiffs – Appellees*,

v.

## STEVEN ARNOLD KING; KING FOR CONGRESS

*Defendants – Appellants*,

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF IOWA
IN CASE NO. 5:21-cv-4024, C.J. WILLIAMS, JUDGE.**

————————

## BRIEF OF APPELLANTS

————————

**M. Keith Blankenship**
**Da Vinci's Notebook, LLC**
**9000 Mike Garcia Dr. No. 52**
**Manassas, VA 20136**
**T: 703.581.9562**
**F: 703.777.1450**
keith@dnotebook.com

*Counsel for Appellant*

## <u>ORAL ARGUMENT REQUEST AND SUMMARY OF THE CASE</u>

Concerning oral arguments, Appellants believe that twenty minutes for each side should be sufficient, but ask for thirty considering the multiple, significant issues.

Plaintiff-Appellees sued Defendant-Appellants as a publicity stunt. A third-party, former employee used Plaintiff-Appellee's copyrighted work without the knowledge of any Defendant-Appellant. However, because Congressman King is publicly disliked by corporate media, Plaintiff-Appellee initiated an extreme media campaign against King, and then sued him and his Committee based on the results of the media campaign that they unleashed. They were never serious participants in the litigation, and their tactics were frivolous against King, and vexatious against the Committee.

Preemption, copyright remittitur procedure, Rule 68 offers in copyright litigation, and the question of creatively claiming costs: these are all questions of first impression in at least this Circuit.

## CORPORATE DISCLOSURE STATEMENT

None of Appellant-Defendants are entities that are required to file a corporate disclosure statement. Congressman Steve King is a natural person, and King for Congress is an unregistered entity.

# TABLE OF CONTENTS

**Page**

ORAL ARGUMENT REQUEST AND SUMMARY OF THE CASE……………i
CORPORATE DISCLOSURE STATEMENT……………………………………ii
TABLE OF CONTENTS………………………………………………………iii
TABLE OF AUTHORITIES……………………………………………………v
STATEMENT OF JURISDICTION……………………………………………...1
STATEMENT OF ISSUES PRESENTED FOR REVEIW…………………….....2
STATEMENT OF THE CASE……………………………….…………...5
    A.    THE STORY OF THE LITIGATION………………………………6
    B.    FARCICAL HARM……………………………………………..8
    C.    FARCICAL INDIGNATION………………………………………8
    D.    FARCICAL DAMAGES……………………………………………9
    E.    FARCICAL CONTROL……………………………………………10
    F.    FARCICAL REPUTATION DAMAGE…………………………….11
    G.    FARCICAL PARTICIPATION……………………………………13
    H.    FARCICAL BUSINESS MODEL…………………………………16
    I.    REDRESS FOR THE FARCE……………………………………17
SUMMARY OF THE ARGUMENT……..………………………………..18
ARGUMENT…………………………………………………………….………20
    I. THE COMMITTEE HAD AN IMPLIED LICENSE TO USE THE
    WORK…………………………………………………….……….20
        A.    LANEY GRINER GRANTED A DIRECT IMPLIED
                LICENSE TO SOCIAL MEDIA USERS TO USE
                THE WORK………………………………………………23
        B.    RECENT EVOLUTION OF IMPLIED LICENSE
                LAW………………………………………………….....23
    II. FAIR USE……………………………………………………24
        A.    LOSING FACTOR…………………………………………25
        B.    WINNING FACTORS……………………………………25
            1.  THE FOURTH FACTOR: THE EFFECT OF THE
                 USE UPON THE POTENTIAL MARKET FOR
                 OR VALUE OF THE COPYRIGHTED WORK…………25
            2.  THE FIRST FACTOR: THE PURPOSE AND
                 CHARACTER OF THE USE……………………………26
            3.  THE AMOUNT AND SUBSTANTIALITY USED……...27
            4.  CONCLUSION…………………………………………29

III. ESTOPPEL AND MISUSE <withdrawn>……………………………29

IV.  PREEMPTION……………………………………………………30

    A. THE PROPER ANALYSIS OF PREEMPTION FOR THE
    RIGHT OF PRIVACY CLAIM CENTERS AROUND
    THE SPECIFIC ACTS INVOKING THE CLAIM……………..30

        1. AGREEMENT……………………………………………30

        2. DISAGREEMENT………………………………………..30

    B. ELEMENTS ARE NOT CREATED EQUAL:
    WHEN DISTINCTIONS LACK A DIFFERENCE……………..31

        1. COMMERCIALITY IS A FACTOR, NOT A
        MANDATE………………………………………………31

        2. *VIVE LA DIFFÉRENCE*…………………………………33

    C. BEYOND THE WORK………………………………………34

V.  THE BURDEN OF PROOF OF UNLAWFUL ACCESS………….36

    A. THE NECESSITY OF THE ALTERATION OF PROOF………36

    B. THE EFFECT OF THE ALTERATION OF PROOF……………37

    C. UNCERTAIN LICENSES……………………………………38

VI.  REMITTITUR……………………………………………………39

VII.  COSTS AND FEES AND RULE 68………………………………..41

    A. KING IS A PREVAILING PARTY………………….…………41

        1. KING IS A PREVAILING PARTY DESERVING
        OF ATTORNEYS' FEES……………………………………42

            a. LANEY GRINER'S LITIGATION PURSUITS
            WERE MANIFESTLY UNREASONABLE…………43

            b. KING FOR CONGRESS'S MOTIVATIONS………..43

            c. THE NEED IN A PARTICULAR
            CASE TO COMPENSATE OR DETER………………45

            d. THE PURPOSES OF THE COPYRIGHT ACT………47

            e. NOVELTY OF ISSUES……………………………48

VIII. APPELLANTS DESERVED A PRIVILEGE LOG AND
CLARK AS A WITNESS SHOULD NOT HAVE TESTIFIED…………..48

IX. APPELLANTS' EXCLUDED EVIDENCE WAS PREJUDICIAL,
 BUT NOT UNFAIRLY SO……………………………………………50

    A. POLITICS…………………………………………………..51

    B. DISTASTEFUL USES………………………………………55

    C. CONCLUSION………………………………………………57

X. COSTS………………………………………………………57

CONCLUSION……………………………………………………...58

CERTIFICATE OF COMPLIANCE……………………………………60

ADDENDUM………………………………………………………..61

# TABLE OF AUTHORITIES

## Cases

*Action Tapes, Inc. v. Mattson,* 462 F.3d 1010 (8th Cir. 2006)........................43

*Advertisers Exchange, Inc. v. Anderson*, 144 F.2d 907 (8th Cir. 1944).............41

*Bourne v. Walt Disney Co.,* 68 F.3d 621 (2d Cir. 1995)..............................37

*Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616 (D. Md. 2020).................31

*Brod v. General Pub. Group, Inc.*, 32 Fed. Appx. 231 (9th Cir. 2002).............28

*Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896 (8th Cir. 2010).......................48

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884).....................28

*Calkins v. Playboy Enters. Int'l, Inc.*, 561 F. Supp. 2d 1136 (E.D.Cal. 2008)......26

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)...........20

*Del Madera Props, v, Rhodes & Gardner*, 8209 F.2d 973 (9th Cir. 1987).........34

*In re DMCA Subpoena to Reddit, Inc.,* 441 F. Supp. 3d 875 (N.D. Cal. 2020)...27

*Dryer v. Nat'l Football League*, 814 F.3d 938 (8th Cir.2016)........................32

*Educational Testing Serv. v. Simon*, 95 F. Supp. 2d 1081(C.D.Cal. 1999).....27-28

*Effects Associates, Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990)......................20

*Facenda v. NFL Films, Inc.* 542 F.3d 1007 (3rd Cir. 2008).......................32-35

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)......................23-24

*Fleet v. CBS*, Cal.Rptr.2d 645 (1996)...............................................28-30

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)........................................43

*Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001).....................................39

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985).....................28

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.,*
    322 F.3d 26, 40 (1st Cir. 2003)...............................................14

*Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789 (7th Cir. 2014).............41-42

*Korman v. HBC Florida, Inc.*, 182 F.3d 1291 (11th Cir. 1999)......................21

*Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2005)........32-34

*Midlevelu, Inc. v. ACI Info. Grp.*, 989 F.3d 1205 (11th Cir. 2021)..................15

*Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849 (8th Cir. 2004).................21

*NBA v. Motorola.*, 105 F.3d 841 (2d Cir. 1997).......................................31

*Nelson-Salabes, Inc. v. Morningside Dev.*, LLC,
    284 F.3d 505 (4th Cir. 2002)................................................21-22

*Ngugi v. Lynch*, 826 F.3d 1132 (8th Cir. 2016)..........................20, 30, 36

*Pearson Educ., Inc. v. Almgren*, 685 F.3d 691 (8th Cir. 2012)....................43

*Ray v. ESPN, Inc.,* 783 F.3d1140 (8th Cir. 2015).....................................31

*Read Corp v. Portec Inc.*, 970 F.2d 816 (Fed. Cir. 1992)...........................40

*Stewart v. Abend*, 495 U.S. 207 (1990)..............................................25

*Thompson v. Looney's Tavern Productions, Inc.,*
    204 Fed. Appx. 844 (11th Cir. 2006)........................................22

*Toney v. L'Oreal U.S.A., Inc.*, 406 F.3d at 907 (7th Cir. 2004)………………..32-35
*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975)…………………..47
*U.S. v. Gilbert*, 721 F.3d 1000 (8th Cir. 2013)…………………………………………50
*U.S. v. Worthey*, 716 F.3d 1107 (8th Cir. 2013)……………………………………..51
*Vanderberg v. Petco Animal Supplies Stores, Inc.*,
    906 F.3d 698 (8th Cir. 2018)………………..…………………………………..49

## Rules and Regulations.

Fed. R. Civ. P. 26…………………………………………………………………………49
Fed. R. Civ. P. 37…………………………………………………………………………46
Fed. R. Civ. P. 68…………………………………………………………………..passim

## Constitution and Statutes

*U.S. Constitution*, Article I, Sect. 8, Clause 8……………………………………47
17 U.S.C. § 107……………………………………….…………………………………25
17 U.S.C. § 505……………………………………………………………………..42

## Secondary Sources

Restatement 2d of Contracts, §29………………….……..…………………………..23

## Law Review Articles

Peter H. Gerns, *Constitutional Law – Equal Protection – Use of Fee Simple Determinable to Enforce Racial Restrictive Provisions*.
N.C. Law Review, Art. 10 Vol. 34, No. 1 (Dec. 1,1955)…………………………...29
Cathay Y. N. Smith. Weaponizing Copyright. Harvard Journal of Law & Technology, Volume 35, Number 1 (Fall 2021)……………………………………45
 Cathay Y. N. Smith & Stacey Lantagne, Copyright & Memes:
The Fight for Success Kid. Vol 110, (Fall 2021)………..……………………..45

## JURISDICTIONAL STATEMENT

This Court's jurisdiction is based on 28 U.S.C. § 1291, establishing jurisdiction over final judgments from a U.S. District Court, which in turn had jurisdiction based on 28 U.S.C. § 1400. Defendant-Appellants underwent trial by jury on November 18, 2022 for the federal claim of copyright and an ancillary claim for which they now seek relief therefrom, orders leading thereto, and post-judgement orders. A first notice of appeal was filed on December 19, 2022; and when the lower court entered a post-judgment order on February 22, 2023, a second/amended notice of appeal was filed (with this Court, rather than the district court) on March 24, 2023.

## STATEMENT OF THE ISSUES AND MOST APPOSITE AUTHORITY

I.     Implied License: Does a copyright holder's public, express urging for a work's unfettered uses result in an implied license commensurate with the urgings.

*See De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927).

II.    Fair Use: Can a copyright holder's public, express urging for the work's unfettered uses demur to uses later based on secret criteria?

*See Calkins v. Playboy Enters. Int'l, Inc.*, 561 F. Supp. 2d 1136, 1144 (E.D.Cal. 2008)

III.   Estoppel and Misuse: <Withdrawn>

IV.   Preemption: Can the mere display of a copyrighted work invoke both copyright infringement and right of privacy's misappropriation without evidence of affiliation?

*See Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616, 627 (D. Md. 2020)

V.    Rearrangement of Proof Burdens: Can a copyright holder's lack of license records related to significant, early licensing result a court requirement that the copyright-holder prove unlawful access rather than requiring the defendant to prove license when it is proven that many authorized versions of the work were made available to the public?

*See Bourne v. Walt Disney Co.* 68 F.3d 621, 631 (2d Cir. 1995)

VI.   Copyright Remittitur. Is it appropriate to wait until a jury has ruled on 'innocent infringement' to determine whether remittitur is appropriate, and ought a judge be granted that discretion rather than a jury?

*See Read Corp v. Portec Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992).

VII.   Costs and Fees. When a copyright defendant prevails against a copyright plaintiff in frivolous, vexatious litigation, and when a second copyright defendant is found liable, but 'innocent,' ought those defendants ought to be able at least to recover attorneys' fees equivalent to a Rule 68 Offer 2000% of the eventual jury award?

*See Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 790 (7th Cir. 2014)

VIII.   Should a district court judge honor a magistrate judge's order for a party to turn over its privilege log when an attorney and business agent are added as damage witnesses weeks past the discovery deadline; and should those damages witnesses, probably bearing expert testimony, be permitted to testify when omitted as witnesses during the discovery period?

*See Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 699 (8th Cir. 2018).

IX.   Can Federal Rule of Evidence 403 prohibit evidence that Plaintiff utilized inflammatory terms to create a controversy based for which she sought

damages; and should a brand owner's distasteful brand uses be allowed to show that a brand lacks the wholesomeness touted by Plaintiff?

*See U.S. v. Worthey*, 716 F.3d 1107, 1114 (8th Cir. 2013)

    X.    Can copying costs be counted through ink from a lower-cost printing alternative rather than a traditional copy shop and its higher rates?

No apposite authority.

## STATEMENT OF THE CASE

**A.    THE STORY OF THE LITIGATION**

It wasn't much of a lawsuit, but as far as publicity stunts go, it was stellar. Your Defendant-Appellant Congressman Steve King is among the most disliked conservatives in America according to corporate media. Defendant-Appellant King for Congress is his Campaign Committee ("Committee"). Your Appellee-Plaintiffs are Laney Griner ("Griner") the copyright holder of the image utilized as a world famous meme and brand, "Success Kid," and the image's subject, her son, Sam Griner ("Sam," collectively, the "Griners"). A meme combines a compelling image with a pithy phrase to invoke a response, usually humor.

Illustration 1. The Copyrighted Work (the "Work")



Illustration 2. Exemplary Memes



GOOGLE lists the Success Kid meme (the "Meme") as a top-five meme world-wide and the most prominent meme-tracking website indicates that the Meme has been used billions of times. App.131(Vol.1), 201-208/R.Doc.43-3, at 22, 91-97. A former-employee of the Committee, albeit with access credentials to the Committee's social media platform, posted the Meme (the "Post") hyperlinked to transfer users to a donation page. App.101-22(Vol.1)/R.Doc.16, at 6. King was wholly unaware of the use and meme-ing. App.616(Vol.2)/R.Doc.80-1, at 85.

Illustration 3. The Post



This single infringing act on a page not even owned by the Committee lasted hours. App.911(Vol.2)/R.Doc.80-3, at 6, ¶23. A social media user warned Griner of the Post, evoking a cease-and-desist letter immediately to the Committee, that it respected immediately. App.911-12(Vol.20/R.Doc.80-3, at 6, ¶¶21-26. The Committee apologized on the same forum that featured the Meme. *Id*.

Appellants concede that Griner's actions to this point were conventional for a copyright holder. The Committee's contrition should have ended the controversy. Good reasons exist for continuing such a controversy, but those reasons won't be found here. A year later, Griner sued the Committee *and King*, for over a year-and-a-half. App.101-111(Vol.1)/R.Doc.16.

The infringing act was commonplace; Griner's publicity-seeking and vexatiousness was orders-of-magnitude more interesting. Contemporaneous to the takedown notice, Griner – who would later feign horror at the public association between King and her son, Sam – leveraged her much larger social media presence to publicly lambaste King and then secretly sic her media team to complain to large corporate media, such as the New York Times, the Chicago Tribune, Time, Newsweek, etc. App.1249-51(Vol.3)/R.Doc., at 70-71; and App.919-20(Vol.2)/R.Doc.80-3, at 14-15 ¶68; App.1252-60(Vol.3)/R.Doc.145, at 71-80. Scores of publications dutifully 'wrote' (read as: "transcribed") the same story based on her press release. *Id*. Her thoughts on the press barrage to her press agent at the time, in an email later accidentally disclosed months after discovery closed:

> **"So much coverage!! This is Fantastic!…I want to talk to everyone interested in covering our story."** *Id*.

She then sued King based on the press coverage that she stoked.

There is an electromagnetic waveform phenomenon in physics called signal resonance. One can craft a circuit, called a tank circuit, that when it receives a known

waveform will resonate and send back the same waveform. There is probably no better metaphor for corporate media and its constituency. The corporate media characterized King as a racist, homophobe, and misogynist. Trolling for publicity Griner put those words right back in her public accusations, including accusing King of "supporting rape and incest.[1]" App.851-871(Vol.2)/R.Doc.80-1, at 320-46(Exs.A09, A17, A18, A23, A24, A25, A26, A27, C44, C45, C46, C47, C48).. Griner knew nothing about King. Her incendiary language was language calculated to attract attention. Although common for conservative politicians; Griner crossed a line when she relied on the publicity farce as the basis of her allegations, which she then hid during discovery. App.240-41(Vol.1).The litigation was a farce staged for publicity purposes.

## B.    FARCICAL HARM

Interestingly, Griner had a much greater, more-effective media machine than a sitting Congressman. App.1301-03(Vol.3)/R.Doc.145, at 822-23. King's social media presence was so inert, that when the Commi1ttee acquired its bank deposits for all of its Internet donations on the date of the Post, the total was $28.92. App.912(Vol.2)/R.Doc.80-3, at 7; ¶30. App.1210-13(Vol.3)/R.Doc.144 at 169-71.

## C.    FARCICAL INDIGNATION

---

[1] King thought that he had heard most of the cliches by now, but "supporting incest" was new, even for him.

King, Griner alleged and stated in discovery, was reprehensible and the association between King and her son damaged the Success Kid brand and its allegedly significant licensing success. When asked for a single indication of harm based on an association between King and the Meme or Sam, Griner produced nothing but naked assertions – and then would casually retract them. Plaintiffs blatantly stated that any such basis was properly the subject for an expert, and then purportedly never supplied one. *See e.g.*, App.977-41/ R.Doc.110-2, at 1, 4 (¶¶17-18) (multiple months past expert testimony due date). When Sam was asked whether anyone had mentioned the King incident to him other than his family, he could not recall a single incident: no stigma, no damage, nothing. App.1236-44(Vol.3)/R.Doc.144, at 257-264. In fact, Sam was not asked if he wanted to be a co-plaintiff in the litigation, and learned of the litigation only months after its filing. *Id*.

## D.     FARCICAL DAMAGES

The Success Kid brand had all but died in 2016. In fact, the year prior to the initiation of this action, there were no licenses for use of the Meme. App.1282-86(Vol.3)/R.Doc.146, at 49-52. There was, however, a tepid resumption of licensing activity after this case's media frenzy. *Id*. When Appellants posit the case was a publicity stunt attempting resurrection of a dead brand, there is significant support.

As licenses dried up, Griner switched tactics: she turned troll. She began suing corporate users of the Meme around the world. When compared to the heyday of her licensing activities, lawsuits were much more profitable. App.1280-82(Vol.3)/R.Doc.145 at 644-45. Early-brand licenses to *Coca-Cola* and *Microsoft*, for example, were financially dwarfed by her handful of litigation settlements to minor entities. What makes Griner a troll was that while she embarked on lawsuits, she actively encouraged widespread use of the Meme through social media. The Meme is a trap.

## E.    FARCICAL CONTROL

Griner asked and begged social media users to use the Meme. App.1126 (Vol.3)/R.Doc.128-109(Ex.C16),    App.778-80(Vol.2)/R.Doc.80-1,    at    247-49 (Ex.B06), App.788-89(Vol.2)/257-58(Ex.C08). She chuckled, raved, and cheered when social media users used the Meme – in the hundreds and thousands. *See e.g.*, App.1099(Vol.3)/R.Doc.128-53(Ex.A03),App.1102(Vol.3)/R.Doc.128-63(Ex.A29), App.1103(Vol.3)/R.Doc.128-69(Ex.A37),App.1104-1108(Vol.3)/R.Doc.128-70-75(Ex.A39-44),App.1110(Vol.3)/R.Doc.128-78(Ex.A48),   App.1111(Vol.3)/R.Doc. 128-79(Ex.A52),App.1112(Vol.3)/R.Doc.128-80(Ex.A55),App.1113(Vol.3)/R. Doc.128-85(Ex.B08),App.1114(Vol.3)/R.Doc.128-88(Ex.B17),    App.1115(Vol.3)/ R.Doc.128-89(Ex.B21),     App.1116(Vol.3)/R.Doc.128-93(Ex.B28),     App.1117-19(Vol.3)/R.Doc.128-94-97(Ex.B30-32),         App.1122-23(Vol.3)/R.Doc.128-

101(Ex.B37), App.1124(Vol.3)/R.Doc.128-103(Ex. B41). She chastised social media users that alerted her to uses of the Meme. App.1100-01(Vol.3)/R.Doc.128-56-57(Ex.A06-07), App.1125(Vol.3)/R.Doc.128-108(Ex.C14). She collected Memes and displayed them in a fan page, often rating them. App.1115 (Vol.3)/R.Doc.128-89(Ex.B21). She was awed about which celebrities and large corporations used the Meme via social media. App.1117(Vol.3)/R.Doc.128-94(Ex.B30). She bragged on her self-created Success Kid fan page, that the Meme was among the most popular memes in the world, and linked to the meme-explanatory website, Knowyoumeme.com, that tracked such things. App.113(Vol.1), 130-37/R.Doc.43-3, at 2,[2]19-28. Knowyoumeme.com provided express instructions on how Internet users could create their own version of the Meme, including links to Image Mass Production ("IMP") sites that assist users. Any judge in this Court could go there and do it, *right now*. Then, Griner, publicly transmitted her own versions of the Meme created on IMP websites with url tags stating to all social media viewers where they could do the same. App.1120(Vol.3)/R.Doc.128-97(Ex.B33), App.1121(Vol.3)/R.Doc.128-100(Ex.B36). It gets better: the independent contractor, Stevens, that created the version of the Meme utilized by the Committee, although uncertain, claims that he constructed the Meme of the Post on the IMGFLIP website recommended by Griner. App.595(Vol.2)/R.Doc.80-1, at 63-

---

[2] See her contact information and link to Knowyourmeme.

64.[3] Griner's activities are not isolated and minimal, but rather a decade's worth of encouragement by the copyright holder.

## F.     FARCICAL REPUTATIONAL DAMAGE

Griner claims that uses of her son's image was carefully monitored in two specific ways, to ensure: (i) nonpolitical uses, and (ii) positive and uplifting messages.     App.1199-1200(Vol.3)/R.Doc.144,     at     70;     App.1288-91(Vol.3)/ R.Doc.145, at 653-656. Association with King, *Griner* explained, violated these principles.[4] App.105-07(Vol.1)/R.Doc.16, at 5-7). When Appellants in discovery asked her whether she could provide examples of uses of the Meme that she found unacceptable, she provided none. App.305,362-63(Vol.1)/R.Doc.65-2, at 60-61, R.Doc.65-3, at 9-10. Congressman King wasn't the Brand's doom, or even close. Appellants were busy and confronted Griner with examples of the Meme that she, herself publicly endorsed in social media and self-created fan page for her son and the Brand.  Among the salacious (i.e., not positive and uplifting) topics that Griner transmitted or displayed to the world, conspicuously with the use of the Success Kid Brand,  include:  marijuana  endorsement,  masturbation  (featuring  her  toddler),

---

[3] Note: Defendants disclosed this fact two months prior to Plaintiffs' disclosure of the same.
[4]      https://www.nytimes.com/2020/01/28/us/politics/steve-king-success-kid-meme.html ("She fears the copyrighted photo of her son, now 13, will become associated with the 'bigotry' of Representative King, an Iowa Republican who used it in a campaign fund-raising ad.")

"boobies," homosexual culture, crass Asian stereotypes, etc. App.835-43(Vol.2)/R.Doc.80-1, at 304-12(Ex.E17-18),*[5] App.655-63(Vol.2)/125-33 (Ex.A61,A65)*; App.1122 (Vol.3)/R.Doc.128-103 (Ex.B41), App.1120(Vol.3)/ R.Doc.128-97(Ex.B33). The political topics associated with the brand by Griner were vast, and largely very leftist, including: allowing the Obama administration to utilize the Meme in support of an immigration bill that resulted in the funding of the infamous 'child cages,' an official endorsement of Bernie Sanders, multiple endorsements of the Meme associated with Sanders, and homosexual relationships. App.746-66(Vol.1)/R.Doc.80-1, at 215-240 (Exs.C53-54,B27,C17,A64,[6]C56,[7]).* On cross-examination, her damages "expert" opined that any use of a brand like Success Kid with political topics is lethal. App.1225-27(Vol.3)/R.Doc.144, at 229-31.

## G. FARCICAL PARTICIPATION

Never did the Griners meaningfully participate in this litigation. App.240-437(Vol.1)/R.Doc.65–R65-3, and App.446-531(Vol.1-2)/R.Doc.70–70-2. When Appellants' filed their discovery requests on November 14, 2021, Plaintiffs did not

---

[5] Note: These Exhibits are reversed in this court filing.

* All Exhibits noted with an asterisk were ruled inadmissible at trial either in motions *in limine* or at trial.
[6] Unallowed at trial.
[7] Unallowed at trial.

respond to them until January 22, 2022. They were threadbare and wholly nonresponsive to the questions asked. Magistrate J. Roberts issued a letter warning Plaintiffs about perfunctory discovery responses. Generally, Appellants asked about the prior uses, licenses, permissions, and acquiescence of the Work; in other words, Appellees' activities. When Appellees sensed that Appellants were going to seriously challenge their use of the Work, they completely shut down. Among the billions of anonymous users, and the thousands of Griner-approved uses, why King? The Appellees responded with embarrassingly inarticulate interrogatory answers, a handful of formal licenses, an explanation of the fame of the Meme, and The Committee's use. Every social media interaction that this Court is reviewing derived from the Appellants' retention of an investigator.[8] Appellants asked for these but Appellees disclosed *none*; prior to revealing their extensive search of the Griner's actual posts, Griner posited that her social media accounts were used for "gardening" and talking with friends. App.966(Vol.3)/R.Doc.101-1, at 6. Furthermore, Griner claimed to be oblivious to the functionality of using a #hashtag – although she had been using hashtags for a decade. App.844(Vol.2)/R.Doc.80-2, at 10(¶45); App.739(Vol.2)/R.Doc.80-1, at 206-09. The magistrate judge was nonplussed by Griner's lack of production and participation, but the policy of a party's non-participation in discovery is widely frowned upon.

---

[8] Ms. Elizabeth Kirby, formerly of Marine Intelligence.

For example, when a party feigns outrage at a disparaging use of an image of her son, and the adversary asks for exemplary alternative disparaging uses for purposes of a juxtaposition and what the party did about it, it deserves an answer. Appellants didn't get an answer, and the reason is clear: Griner's umbrage was fake; she wasn't concerned about disparaging uses, she was concerned about uses by lucrative targets. The answer was embarrassing, so she didn't give one; and the district court implicitly condoned this. App.418-37(Vol.1)/R.Doc.65-3, at 64-83. Under no set of objective circumstances is a social media post by a Committee, for a largely-ignored Congressman, stating that it is "owning the libs" more concerning than the bizarre, distasteful posts, collected and displayed by Griner on her son's fan-page.

The magistrate judge, did eventually order answers, but these answers did not arrive until two months after the close of discovery and two motions-to-compel. When it saw the results, the court should have been furious. It wasn't. Appellants suggest that it was plain that Appellees simply did not want to disclose facts contrary to their simplistic narrative, or simply did not even deign to participate. The indignity reached its lowest point when Plaintiffs refused to disclose a damages estimate stating that it was premature for such an estimate "at this time" notwithstanding that discovery had been closed for a month! App.938-41(Vol.3)/R.Doc. 99-2, at 2-5.

Illustration No. 4: Discovery Timeline



## H.    FARCICAL BUSINESS MODEL

There was never a single articulable basis of damage for Appellees.  They spent 1.5 years suing Appellants for income that a teenager charges for mowing a lawn in suburbia.  Holding not a single settlement agreement in excess of $25,000.00 and not a single license agreement in excess of $15,000.00, Plaintiffs demanded $58,000.00 from Defendants. King was determined a lucrative, sensitive target. When two months prior to trial Defendants slipped the Plaintiffs a Rule 68 Offer for $15,000.00, it was accommodating. App.1165-73(Vol.3)/R.Doc.139-3, at 38-45. Plaintiffs planned to offer two new damage witnesses not disclosed during discovery, and offered new economic theories on the eve of trial. Plaintiffs withdrew one of the witnesses, but not the other, which the district court allowed over Defendants

objections. App.56-57(Vol.1)/R.Doc.109, at 12-13/Add.63-64; App.62(Vol.1)/ R.Doc.116, at 4.

## I.      REDRESS FOR THE FARCE

Defendants Rule 68 amount wasn't simply greater than the final jury award of $750.00; it was 2000% of the Rule 68 amount. King offered the Griners more than *Coca-cola* paid them for use of the Meme ***in a Super Bowl advertisement***. App.1287(Vol.3)/R.Doc. 145 at 652; App.1196-98(Vol.3)/R.Doc.144, at 68-69; App.1128-30(Vol.3)/R.Doc.144, at 188. The jury also reached the rare result of "innocent infringement" for the Committee, and found the Committee not liable on the remaining counts of vicarious liability for copyright infringement and right of privacy. App.70(Vol.1)/R.Doc.130/Add.77. Naturally, the jury found King not liable on all three counts. *Id*. In total: King won outright all three claims against him; the Committee won two of three claims, and for this one loss, there was a Rule 68 offer. Defendants asked for attorneys fees', based on either Title 17's cost award (for outright victories) or the spurned Rule 68 Offer (for the sole loss by the Committee). Irrespective, Defendants asked only for the Rule 68 Offer amount. The Court denied this. The Committee, as an innocent infringer, asked for post-judgment remittitur, which was denied procedurally.

# SUMMARY OF THE ARGUMENT

There are approximately ten bases of review. Appellants seek review of the district court's assessment that the Committee was an infringer. For the many years wherein Griner encouraged propagation of her work, the court should have found "fair use" and demarcated boundaries of an implied license obviating the need for an arm's-length relationship between Griner and the Committee. Griner so encouraged third party use of her work, and licensed that work its fledgling existence without records of the entities, scope, etc thereof, that the court ought not have denied Plaintiff-Appellants their request to require Griner to prove unlawful access rather than the orthodox burden of proof, which necessitates a defendant's proof of license.

Sam's claim of right of privacy is pre-empted. Although all Defendant-Appellants won this claim, to the extent that this Court awards Appellants their attorneys' fees, or remands to the court with instructions concerning a cost award, the claim's absence may figure significantly. Defendant-Appellants ought to have been awarded their costs in this action, which according to copyright, may include attorneys' fees. Defendant-Appellant Steve King ("King") was an Iowa congressman much maligned by corporate media, and his inclusion as a defendant was frivolous and a vexatious litigation tactic. He prevailed on all claims. His Committee, although losing the single claim of copyright infringement, was

adjudged an "innocent infringer," a rare label indeed. However, all Defendant-Appellants offered all Plaintiff-Appellees a Rule 68 offer of $15,000.00, which they spurned.

The jury would eventually award Griner the statutory minimum in damages of $750.00 from the Committee approximately two months after the Rule 68 offer. King and the Committee sought their costs, including their attorneys' fees, but only up to the Rule 68 offer amount + actual costs. The district court would deny all Defendant-Appellants their attorneys' fees – and some actual costs. Also, the district court procedurally denied the Committee remittitur based on the jury finding of innocent infringement, claiming that the question ought to have been placed before the jury.

There were also evidentiary irregularities. The district court denied certain evidence related to political concerns and non-commercial uses of a brand. Facially, these rulings seem logical, but a deeper reading of their use compels a finding of their necessity. This case, seemingly political, was never about politics; but rather the exploitation of political themes for publicity purposes. Furthermore, Plaintiff-Appellees were blatantly hiding evidence behind privilege concerns. The Magistrate judge ordered Plaintiff-Appellees to disclose a privilege log, which they never did; and when Defendant-Appellants asked the presiding judge to honor the demand, he did not. Also, Plaintiff-Appellees were shockingly evasive in their discovery tactics.

Redress is needed.

<center>**ARGUMENT**</center>

## I. THE COMMITTEE HAD AN IMPLIED LICENSE TO USE THE WORK.

*Standard of Review:* The scope of an implied license is a question of law reviewed *de novo, Ngugi v. Lynch*, 826 F.3d 1132, 1136 (8th Cir. 2016).

Implied licenses began legal life as broad directive: actions have consequences. Implied copyright licenses evolved into more narrow affairs laden with factors. These factors may be occasionally helpful; here there is little relationship between these factors and social media reality. Some Circuits have prioritized the broad directive over specificities, others not. The district court followed found the factors moreso than the general directive to hold that the Committee lacked an implied license. This Circuit should prioritize the general directive when considering social media use.

### A. LANEY GRINER GRANTED A DIRECT IMPLIED LICENSE TO SOCIAL MEDIA USERS TO USE THE WORK.

A nonexclusive license may be…implied from conduct." *Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990)(J. Kozinski). An implied license can be found where the copyright holder engages in conduct "from which [the] other [party] may properly infer that the owner consents to his use." *See De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927). "The touchstone for

<center>20</center>

finding an implied license . . . is intent." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). We ask whether "the totality of the parties' conduct indicates an intent to grant such permission." 3 Nimmer on Copyright § 10.03[A][7], at 10-42 (2000).

The test most commonly used nationally in determining if an implied copyright license exists requires an arm's-length transaction and the proceeds to analyze whether the licensee requested the work, whether the creator made and delivered that work, and whether the creator intended that the licensee would copy and make use of the work. *See e.g.*, *Nelson-Salabes, Inc. v. Morningside Dev.*, LLC, 284 F.3d 505, 514 (4th Cir. 2002).[9] However, creating material at another's request is not the essence of a license; an owner's conduct is. *Midlevelu, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021). When an owner's conduct "clearly" manifests "a consent to . . . use" of copyrighted material, the owner impliedly grants a nonexclusive license. *Id. citing De Forest*, 273 U.S. at 241.

This *Nelson-Salabes* arm's length transaction or meeting-of-the-minds test may have utility for software, but for social media transactions numbering in the billions, a more general, flexible test ought be considered. *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999)(A nonexclusive license can be implied

---

[9] *Nelson-Salabes* factors have penetrated many Circuits, with a beachhead in this Circuit – in Minnesota. *Haddley v. Isanti County*, 2015 U.S. Dist. LEXIS 198182 * 24 (D. Minn).

from the parties' conduct.).  *Thompson v. Looney's Tavern Productions, Inc.*, 204 Fed. App. 844, 850-851 (11th Cir. 2006) (plaintiff's counsel and co-owner's statements, after reviewing script, were sufficient to create license).

The district court rigidly adhered to the *Nelson-Salabes* factors to hold that an implied license could not exist because there was no relationship between the parties. The district court granted the Appellees' motion to direct a verdict, dismissing the capacity of an implied license.[10] App.1308(Vol.3)/R.Doc.145, at 286. The jury instructions expressly incorporate the *Nelson-Salabes* factors determined by the Summary Judgment order, App. 29-33/R.Doc.86, at 22-26/Add.36-40, and constituted in the jury instructions App.1070(Vol.3)/R.Doc.119-1, at 20. Griner's myriad and lengthy actions concerning her encouragement and propagation of the Meme should be weighed under the general directive, rather than *Nelson-Salabes* factors. When Griner asks the social media universe to create the Meme, and it does, her capacity to single out individual copyists ought be severely curtailed. The real question is: Why wouldn't someone feel justified using the Meme in social media?

What surfaced at trial is Griner engaged in non-public licenses and lawsuits based on the Meme's extreme notoriety. Also, the business model was exposed:

---

[10] The court characterized Defendants as "withdrawing" the defense, but they did not. App.88(Vol.1)/R.Doc.161, at 17/Add.95. Defendants stated that they could not prevail under the standard articulated by the Court. App.1304-10(Vol.3)/R.Doc.145, at 283-88, and App.707-10/R.Doc.145 at 837-839.

lawsuits against commercial also-rans netted Griner much more revenue than her secretive licenses with commercial giants *Microsoft* and *Verizon*. When the Committee utilized the Meme the same ways as billions of others, she must have blessed her lucky stars; but she didn't know King very well. Trolls may have an innate sense to sense vulnerability, but not so with character. King would pay no ransom.

### B. RECENT EVOLUTION OF IMPLIED LICENSE LAW

Copyright law historically infrequently dealt with mass transactions. Copyright is no stranger to mass-viewing; but the transactions that allowed them were select. The Internet changed the licensing landscape. Website 'terms of use,' for example, are drafted to empower a class of users. Contract law teaches that a contractual party can be either an identified person or a class. Restatement 2d of Contracts, §29. Comment b explains: "An offer may create separate powers of acceptance in an unlimited number of persons, and the exercise of the power by one person may or may not extinguish the power of another." Recently, Copyright licenses are following suit. *See e.g., Field v. Google, Inc*., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006).

Appellants recommend *Field* to the attention of this Court. This Court's website allows GOOGLE to parse its website data to display results in a search engine. This Court and GOOGLE lack an arm's length relationship. GOOGLE feels

justified in scouring this Court's website because this Court's Internet-Technology provider *has not*[11] specifically instructed GOOGLE otherwise. HTML, which provides standards for website creation, adopts the use of a Robots.txt file; and in this file, a website in its HTML code can instruct search engines that the website does not wish to be "spidered" (i.e., rendered search-engine-indexable). Plenty of websites don't wish to appear in search results. GOOGLE, though large and oppressive, performs a significant service to humanity; and in *Field*, a malcontent tried to exploit implied license law to trap GOOGLE.

Pre-*Field* was probably the extent of the pendulum concerning specific factors. Towards generalities we go. When in doubt obey first principles, and this Court has an opportunity, because of its relative dearth of 'implied license' law to spearhead the swing. This Court merely needs to identify the self-evident principle that one cannot beg for, cheer on, instruct, cajole, and fawn over public uses of copyrighted content in mass social media, only to demur when someone that she finds "abhorrent" takes her at her word.

## II.    FAIR USE

*Standard of Review*: Fair use is a mixed question of law and fact. *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 855 (8th Cir. 2004)

---

[11] This is important, and the district court in its analysis got this wrong; you don't ask a search engine to be spidered, you have to instruct it to leave you alone.

For all the reasons that an implied license might apply, 'fair use' ought *a fortiori* apply. Copyright liability is broad. A copyright holder instructs third parties publicly in an international platform to take and use her rights; they do, and then she picks-and-chooses among selective targets to sue in pursuit of a troll's business model. The code sets forth four non-exclusive factors considered in determining whether an otherwise infringing use is a non-infringing fair use. 17 U.S.C. § 107. The jury found that the Committee's use did not constitute fair use.

## A. LOSING FACTOR

The Committee agrees that the "the nature of the use" factor weighs against it. Photographs, generally, deserve copyright protection. Although the extent of deserved-protection may vary downward when the subject chooses the pose and activity, as discussed below. *But see Stewart v. Abend*, 495 U.S. 207, 237 (1990)(" factual works [merit fair use protection more] than…fictional works"). This single factor weakly favors Appellees.

## B. WINNING FACTORS

All remaining factors weigh strongly in The Committee's favor.

### 1. THE FOURTH FACTOR: THE EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR VALUE OF THE COPYRIGHTED WORK.

The fourth, and most important fair use factor weighs strongly in Appellants' favor: the effect of the use upon the potential market for or value of the copyrighted

work. Sardonically, copyright attorneys in jest posit that no movie or music profits, and that infringements aid in the work's recognition. The caselaw is replete with these usually unavailing assertions; but sometimes they are true. In the present case, the idea that the apparent infringement energized the 'Success Kid' brand is supportable from the plaintiff's own mouth and business records. The records demonstrate the brand's peak in 2012 only to die a slow death around 2018. From Griney's own email to her agent, she described the publicity related to the use as "fantastic." App.1271-72/R.Doc.145 at 623-24. In 2016, Griner referred to Success Kid as a "has-meme." App.1283-85(Vol.3)/R.Doc. 145, at 649-50. This Court should listen to her. *Calkins v. Playboy Enters. Int'l, Inc.*, 561 F. Supp. 2d 1136, 1144 (E.D.Cal. 2008)("widespread publication of the Photograph [had] a positive effect on the potential market…by increasing demand for reprints. Accordingly,…use of the Photograph had no demonstrable effect upon the potential market for, or the value of, the Photograph, [therefore] this factor weighs strongly in favor of…fair use.")

The year prior to the Committee's infringement, Griner showed *no brand licensing*; and then the year afterwards, the brand returned to its long-lost average of two licenses/year – although purely based on expectancy rather than direct monies.

## 2.  THE FIRST FACTOR: THE PURPOSE AND CHARACTER OF THE USE.

The dominant feature of the purpose and character of the Committee's use is that *it is exactly like billions of other uses.* The use is political; but so are many of the other uses; and significantly, similar to those propagated and/or judged by Griner. The character of the use of subdued; unlike several of Griner's political uses, the Post did not include images of King – just Sam in front of the Capital. When Griner's own uses include affiliation with Donald Trump, Barack Obama, and Bernie Sanders, an affiliation with King does not seem markedly deviant.

Griner certainly acquiesced to the purpose of the use as a meme. Memes are generally purpose-built for commentary and criticism, two well-known bedrocks of fair use. *In re DMCA Subpoena to Reddit, Inc.,* 441 F. Supp. 3d 875, 884-85 (N.D. Cal. 2020). She consciously avoids interfering with the IMP websites that generate the notoriety that fuels the Success Kid brand to ensure that this sort of commentary keeps Success Kid relevant. Stevens even got the Meme from the same place that Griner did, IMGFlip.

### 3. THE AMOUNT AND SUBSTANTIALITY USED.

The amount and substantiality of the portion of the Work used is more complicated. The amount used, Sam and his gesture, was only that necessary to convey emotions associated with the Meme. Caselaw teaches courts to discern the "heart" of the expression; and admittedly, Sam, in gesturing, is the most interesting element, but not the creative heart. *See Educational Testing Serv. v. Simon*, 95 F.

Supp. 2d 1081, 1088 (C.D.Cal. 1999)(It is the "creative heart" that matters) *citing Harper & Row, Publrs. v. Nation Enters*., 471 U.S. 539, 544 (1985). If one were to think of the Work as a series of creative elements, rather than interesting elements; Defendants took the least creative elements – at least from the nominative owner, Griner. The Committee used no Work portions derived based on Griner's creativity. The Committee used only interesting elements, not creative elements, e.g. the scenery. Griner, the photograph-taker, admitted Sam disobeyed instructions and ate sand. In other words, Griner was not the author of the Work portions taken by the Committee; if anyone is, it is Sam. App.909(¶4)(Vol.2)/R.Doc.80-3, at 4; App.543-48(Vol.2)/R.Doc.80-1, at 12-17.

In one of the first Supreme Court pronouncements on photography's creative aspects, it unabashedly grappled with elements of originality to award a copyright protection to a photograph's subject rather than the photographer. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). Even when a photographer is an author on the slightest of premises, the subject may be the author – even if not to the exclusion of the photographer. *See e.g., Brod v. General Pub. Group, Inc.*, 32 Fed. App.. 231, 233–34 (9th Cir. 2002)(During the photo shoot, defendant selected the subject matter, positioned props appropriately, and suggested angles and alterations "before [plaintiff] triggered the shutter").

Furthermore, the amount of substantiality of the Work used was equivalent to the IMP's large-scale Meme uses. There are two versions of the Meme: the "I hate sandcastles" version, that implies violence, and the "Success Kid" version, that implies success. The former is Sam on the beach, the latter is Sam *sans* scenery (usually with blue triangles in the background). The amount and substantiality used was equivalent to be nondescript among the billions of other uses.

## 4. CONCLUSION.

It is unfair to release property into the world only to pick and choose targets based on secret, subjective criteria. The idea of loosing property only to attempt to conditionally reclaim it based on social and political considerations of the users has been largely on the decline since the 1950s. *Cf.* Peter H. Gerns, *Constitutional Law – Equal Protection – Use of Fee Simple Determinable to Enforce Racial Restrictive Provisions*. N.C. Law Review, Art. 10 Vol. 34, No. 1 (Dec. 1, 1955).[12] The independent contractor that made the Post is doing exactly what Griner asked social media to do; particularly since he went to the site that she promoted, literally. He did as social media does. There was only one difference between the Post and the other billions; Griner knew that the corporate media hated King, and significant public kudos awaited an attack.

## III. ESTOPPEL AND MISUSE

---

[12] https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=5907&context=nclr

&lt;withdrawn&gt;

## IV. PREEMPTION

*Standard of Review:* The scope of preemption is a question of law reviewed *de novo*. *Ngugi*, 826 F.3d at 1136.

The court held Appropriation not preempted by Copyright. App.38-40(Vol.1)/R.Doc.86, at 31-33/Add.45-47. Appellants never asked for this. Instead, Appellants asked the court to consider a narrow range of facts supporting Appropriation *could be* preempted by Copyright. The court answered the unasked question to determine that Appropriation survived generally, in spite of Copyright.

### A. THE PROPER ANALYSIS OF PREEMPTION FOR THE RIGHT OF PRIVACY CLAIM CENTERS AROUND THE SPECIFIC ACTS INVOKING THE CLAIM.

#### 1. AGREEMENT

Appellants agree that the court disclosed the proper preemption framework in the Summary Judgment Order, and that the consideration of Title 17's scope is correct. Defendants also don't disagree with the Court's analysis that Title 17 doesn't preempt Appropriation. Appellants suggest merely Section B(2) is in error.

#### 2. DISAGREEMENT

Appellants do not believe that Title 17 preempts *in toto* the 'Right to Privacy'; rather that particular acts covered by Title 17 co-extensive with Appropriation are preempted. Only when Appropriation turns on this narrow factual set should

Appropriation be preempted. The Second Circuit deemed this "partial preemption." *NBA v. Motorola*., 105 F.3d 841, 849 (2d Cir. 1997). Courts examining the issue arrived at this conclusion, while declining to hold that Title 17 *in toto* preempts Appropriation. Appellants ask this Court only to apply partial preemption over the narrow factual set of facts as occurred here. *Brantley v. Epic Games, Inc.* directly addressed this issue. 463 F. Supp. 3d 616, 627 (D. Md. 2020).

> But the rights protected by the unfair competition claims are not qualitatively different from those protected by the Copyright Act because the gravamen of both types of claims is the misappropriation of an original work. The same act which constitutes Brantley and Nickens' unfair competition claim and the rights protected by the Copyright Act is the "copying [of] the original video of the Running Man and/or copying an identical version of that video . . . .". The claim for unfair competition is not "qualitatively different" from a claim for copyright infringement and does not describe behavior other than the alleged copying.

## B. ELEMENTS ARE NOT CREATED EQUAL: WHEN DISTINCTIONS LACK DIFFERENCE.

The court found "Success Kid" fell "within the subject matter of copyright," App.39-40(Vol.1)/R.Doc.86, at 32-33/Add.46-47, and applied a test contained in *Ray v. ESPN, Inc.*, to ascertain whether facts underlying Sam's Appropriation claim was equivalent to Title 17's exclusive rights. 783 F.3d1140, 1142 (8th Cir. 2015). Appellants believe the court doubly: (1) its interpretation of the test translating a factor as an mandate, and (2) in finding equivalence of right (which substantively differs from finding equivalence of subject matter).

### 1. COMMERCIALITY IS A FACTOR, NOT A MANDATE.

Appellants agree *Ray* contains the correct analysis standard, but disagree with the court's rationale concerning the commercial/non-commercial dichotomy. The court took the position that because a finding of non-commerciality mandates a holding of preemption that the reverse must be true, *i.e.,* a finding of commerciality mandates 'non-preemption.' App.43(Vol.1)/R.Doc.86, at 36/Add.50. In *Ray* this Court did nothing more than mention the possibility that commerciality of an work informs the test of preemption.

> Due to the state's interest in protecting consumers, a right-of-publicity suit challenging the use of a copyrighted work in a commercial advertisement *could have* purposes unrelated to the aims of copyright law.

*Dryer v. Nat'l Football League*, 814 F.3d 938, 943 (8th Cir.2016) (emphasis added) *citing Facenda v. NFL Films, Inc*. 542 F.3d 1007, 1029 (3rd Cir. 2008). This Court then went on to find the potential for commerciality.

If this Court were to maintain that commerciality *ipso facto* leads to a negation of preemption for Appropriation, this logic would ignore the foundations of *Ray*. *Ray* is premised on *Facenda*, which is in turn is explicitly based on three foreign cases. *Id*. at 1030 *citing Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2005); *Fleet v. CBS*, Cal.Rptr.2d 645, 646-47 (1996); and *Toney v. L'Oreal U.S.A., Inc.*, 406 F.3d at 907 (7th Cir. 2004). Although the *Sony, Fleet, Facenda,* and *Toney* courts all found commerciality, in *Sony* and *Fleet* the court nevertheless held appropriation claims preempted. Therefore, commerciality is not a direct indication

of non-preemption, and the shade of commerciality matters (in particular, as discussed in the next section). The Ninth Circuit cautions that when a claim's commerciality is indistinguishable from acts that fall within Copyright, preemption applies. A well-crafted, robust test ought to have the fidelity to predict the outcomes of its foundational cases; if not, there is a weak link in the logic.

## 2. *VIVE LA DIFFÉRENCE*

The Ninth Circuit also adopted the 'equivalence' and 'extra element' test of preemption[13], and has squarely addressed its significance. "The extra element must transform the nature of the action." *Sony*, 448 F.3d at 1143-44. In *Sony*, a copyright plaintiff sued a defendant recording company for copyright infringement and Appropriation (i.e., invasion of privacy). *Id.* 1136. When the district court found that the entire basis of the Appropriation claim was premised on the defendant's use of a snippet of the copyrighted song at suit, the court held that although the appropriation claim included additional elements, these elements lacked qualitative differences. *Id.* 1139. The Ninth Circuit affirmed the court's holding stating: "Although the elements of [the] state law claims may not be identical to the elements in a copyright action, the underlying nature of [plaintiff]'s claims is part and parcel of a copyright claim." *Id.* at 1144.

---

[13] California courts seemingly combine them into one test, where the 'extra element' test restates the 'equivalence' test.

The defendant licensed the plaintiff's song, and then excerpted a small portion to intermingle into a new song. *Id*. at 1144-45. The plaintiff argued that additional facts demonstrated that her claim was not based on the defendant's mere act of reproduction, but "is for the use of . . . [plaintiff's] voice, the combination of her voice with another artist, and the commercial exploitation of her voice and name in a different product without her consent. *Id*. at 1144. The Ninth Circuit disregarded this argument: "the additional element of 'commercial purpose' does not change the underlying nature of the action." *Id*. at 1145; *And see Del Madera Props, v, Rhodes & Gardner*, 8209 F.2d 973 (9th Cir. 1987)(The existence of a fiduciary obligation "as an extra element" did not transform a copyright case to another tort).

*Sony* is compelling in the present instance. A defendant portionally reproduced a copyrighted work for inclusion in a new work. Both this Court and the Ninth Circuit determined that the 'use' was commercial; however, Griner's sole complaint is based on the use of the work as a work – lacking any ancillary substance.

## C. BEYOND THE WORK

Before this Court reaches the conclusions of *Toney* and *Facenda* (rather than *Fleet, Sony,* and *Del Madera*), wherein preemption was held inapplicable, there are multiple important factual distinctions to confront. For example, unlike the court, the respective courts found the subject matter in controversy beyond copyright's scope. *Facenda*, 542 F.3d at 1027. ("We hold that Facenda's voice is outside the

subject matter of copyright"); *Toney*, 406 F.3d at 910 ("A person's likeness — her persona — is not authored and it is not fixed."). Furthermore, the courts noted that each defendant disregarded arms-length contractual rights of the plaintiff. *Facenda*, 542 F.3d at 1012 (plaintiff expressly withheld endorsements from transfer); *Toney*, 406 F.3d at 907 (plaintiff used the endorsements "beyond the authorized time period"). Finally, and the decisions seemed to turn on this fact: that the plaintiffs sued on (i) rights of publicity, and (ii) defendants' actions surpassed mere reproduction of copyright, but rather, *constituted an endorsement*. In this case, the Complaint states, not that Sam' endorsement has any value, but rather that Appellants in utilizing the photograph are free-riding on the "success theme" of the work. App.104-105(Vol.1)/R.Doc.16, at 4-5.

Appellees don't even pretend that Sam's endorsement force of any caliber, and advanced no arguments/evidence along these lines. Griner emphatically explained that she tried to keep Sam away from political themes, and that no one would believe that Sam would endorse politicians. When someone created a Meme indicating that he "endorsed" Sanders, Griner explained:

Q. Were you mad that somebody affiliated the Success Kid meme with Bernie Sanders?
A. No, I don't believe so.
Q. Did it matter that this is -- Do you agree that this is somewhat political?
A. I think this is overtly political, yes.
Q. "Officially endorses," is that tongue in cheek, or is that --
A. Yes. I mean, how -- he was 10 here, so yes. He doesn't officially endorse anyone, so it was tongue in cheek, and I -- yes.

App.972-75(Vol.2)/R.Doc.101, at 11-14.

So, how is it, in a scenario where Griner, Success Kid's mother, publishes to the world that "Success Kid, Sammy Griner, officially endorses Bernie Sanders for president," and emphatically denies any endorsement value, yet when the Committee posts a meme with Sam's iconic, ubiquitous pose with the language "fund our memes," the Griners assert an endorsement of King? *See, e.g.*, App.751-759(Vol.2)/R.Doc.80-1, 220-21 (Ex.C54,*C53,*B27*). The differential is substantial.

## V. THE BURDEN OF PROOF OF UNLAWFUL ACCESS

*Standard of Review: This Court reviews questions of law de novo. Ngugi, 826 F.3d at 1136.*

### A. THE NECESSITY OF THE ALTERATION OF PROOF.

It is axiomatic in English common law the accuser must offer proof of guilt. Copyright, for stellar reasons, against which Appellants do not argue generally, that a defendant must show right of access (i.e., a license). However, Circuits have cautioned against this mechanism in totality, including the Second Circuit. This was prescient and unusual prior to social media; but now, the nation is in circumstances whereby media is loosed upon the world without let or hindrance, and when a plaintiff admits to such, and further admits to lacking any sort of licensing records for mass, prior licensing, there should be some empathy for the defendant's capacity

to prove rightful access. Appellants asked that the court employ this principle in a motion to dismiss, motion for summary judgment, and in jury instructions; all of these requests were denied. App.27-28(Vol.1)/R.Doc., at 86-87/Add.34-35; App.1047-48(Vol.3)/R.Doc.117, at 2.

In *Bourne v. Walt Disney Co.*, a plaintiff-owner of several well-known Snow White songs brought suit against defendant-Disney to seek damages for distribution of the songs on videocassettes. 68 F.3d 621, 631 (2d Cir. 1995). When the district court charged the jury plaintiff had to prove that Disney's use of the compositions was unauthorized, the plaintiff appealed. *Id*. at 630-31. The Second Circuit affirmed the court's instructions: "[plaintiff] is correct insofar as it contends that the possession of a license by an accused infringer traditionally has been characterized as a matter of affirmative defense. However, in most of the cases addressing the defense of license, the issue has been whether a license is held by the accused infringer." *Bourne*, like many infringement cases, involved infringement in derogation of licensed rights, and because tied to contractual performance, the plaintiff would be required to prove not only 'copying' but also contractual 'breach.'

## B. THE EFFECT OF THE ALTERATION OF PROOF.

A mathematician would rightly point out that early, unfettered disclosures of media would play a much greater role than relatively recent disclosures of the same media. Computer transactions obey an exponential growth functions rather than

arithmetic growth functions, because there is a one-to-many relationship between social media posts. This is not conventional infringement. Where a copyist could have rightful access to a work, it ought to be incumbent on the plaintiff to allege not only the basis of 'copying' but also the rationale for why 'rightful access' cannot be established.

Of the billions of uses of the Work as a Meme, it ought to be incumbent on Appellees to explain why the Committee's use of the Meme derives from an unauthorized copy. There is a significant gap in the licensing history – as Appellants demonstrated to the court, there is significant reason to believe that Appellees 'gave away' their rights of sublicensing. Appellees did not contest this, but rather clung to their *prima facie* burden. Appellants posit to this Court that if the Committee utilized a version of the Work that was validly sublicensed for the period for which Griner kept no licensing records of parties or scope, or if the Committee utilized a version of the Work that Griner expressly approved via social media, the Committee cannot infringe. When there are billions of uses of one of the world's most popular images, and the initial licensing (which included sublicensing rights) are "missing," it is appropriate to shift the burden back to the plaintiff to prove unlawful access.

### C. UNCERTAIN LICENSES

Pre-2012, Griner licensed the Work to unknown entities having unknown rights prior to her registration of the Work. The social media site, Flickr.com, for

which she was a member had function that allowed you to submit images for licensing. App.624-28(Vol.2)/R.Doc.80-1, at 93-97; App. 913(Vol.2)/R.Doc. 80-3, at 8, ¶34-37. She did this, but has no contracts, no licensee lists, and no knowledge of the rights provided. *Id*. She also provided a license to Getty Images, a large image clearinghouse. *Id*. Again, with no contracts, licensee lists, or knowledge of the rights that she provided. *Id*. She learned that the brands *Vitamin Water* and *Verizon* licensed her work without her knowledge because a friend saw the advertisement in a movie theater, and she had no idea what their rights included. *Id*. App.1183-85(Vol.3)/R.Doc.143, at 172-73. Also, several of the entities to which Griner provided the work are notorious for broad sublicenses. App.146-57(Vol.1)/R.Doc. 43-3, at 35-46. Naturally, if the Committee used a rightfully licensed version, it would not be an infringer. Based on Griner's past conduct, there is a compelling reason to provide her with the burden of proof concerning unlawful access rather than the Committee to prove license.

## VI.    REMITTITUR

*Standard of Review:* This Court reviews issues of statutory construction *de novo*. *Foulk v. Charrier*, 262 F.3d 687, 703 (8th Cir. 2001).

It is complicated to take exception to the district court's holding that remitter is a factual question decided by the jury considering the wholesale national dearth of caselaw concerning the topics of 'innocent infringement' and 'copyright

remittitur.' App.1299-1300(Vol.3)/R.Doc.160, at 5-6. This is a case of first impression in  this Circuit – and frankly, most.

Appellants recommend to this Circuit the idea that copyright remitter is conceptually the inverse of patent additur.  The plain reading of the relevant copyright section states that the "Courts" have "discretion" to "lower the minimum where the infringer is innocent" to approximately 1/3 the lowest statutory minimum. 17 U.S.C. § 504. Analogously, the patent additur statute states as follows: "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.  The Federal Circuit has long maintained that patent additur is within the court's discretion, and so inextricably linked the idea of "willful infringement" to additur that it has directed district courts to explain the basis for granting or denying additur upon a finding by a jury of willful infringement. *See e.g., Read Corp v. Portec Inc*., 970 F.2d 816, 828 (Fed. Cir. 1992).

The court below submitted jury instructions for infringement, and then a the possibility of "willful infringement" or "innocent infringement." The jury returned a finding of "innocent infringement."  Then the jury awarded the lowest possible statutory damages of $750.00 based on a range provided to them of $750.00 to $150,000.00. App.68-69(Vol.1)/R.Doc.130, at 2-3/Add.75-76.

Accordingly, the Committee asks this Court to effectuate the plain text of the copyright remitter statute to hold that remitter is a legal issue. To the extent that it is

unclear, this Court could do worse than analogize copyright law to patent law as a business model that broadly seems to work well – and has done for some time, and may well serve as instructional to answer future questions concerning remittitur.

## VII. COSTS AND FEES AND RULE 68

*Standard of Review*: Failure to award attorneys' fees is reviewed under an abuse of discretion standard. *Advertisers Exchange, Inc. v. Anderson*, 144 F.2d 907, 909 (8th Cir. 1944).

The court ruled that Appellants did not deserve an award of attorneys' fees for a combination of successful copyright defense, for King, and the existence of a spurned Rule 68 offer, for the Committee. App.76-87(Vol.1)/R.Doc.161, at 5-15/Add.83-94. Defendants deserved to have their costs paid, and among those costs, attorneys' fees ought to be included. Appellants never asked for the entirety of their attorneys' fees from beginning-to-end, only from the Rule 68 Offer. Appellants agree that the court had no obligation to award attorneys' fees to them based on their five-of-six victories or their Rule 68 Offer for the single "loss." The court should have, though. Appellants sought to simplify the conclusion, and the district court was not receptive. Under appropriate circumstances, the copyright provides for recovery of attorney's fees to the prevailing party "as part of the costs."

### A. KING IS A PREVAILING PARTY

King was an outright winner of all litigation claims: copyright, invasion of privacy, and vicarious liability for both. There is no formulation of 'prevailing party' that negates this label. *Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 790 (7th Cir. 2014). The Seventh Circuit goes as far to explain that as a consequence of successfully defending infringement the defendant is entitled to a "very strong" presumption in favor of attorneys' fees, to ensure that an infringement-defendant employs a meritorious defense in situations in which "the cost of vindication exceeds the private benefit to the party." *Id*. (quotes retained).

That Court observed that commentators by-and-large cheered this viewpoint.

> We're not alone in expressing these concerns. See Michael J. Meurer, "Controlling Opportunistic and Anti-Competitive Intellectual Property Litigation," 44 Boston Col-lege L. Rev. 509, 521 (2003). See also Ben Depoorter & Kirk Walker, "Copyright False Positives," 89 Notre Dame L. Rev. 319, 343-45 (2013), where we read that many persons or firms accused of…infringement find…"more cost-effective to simply capitulate" than to fight, even when the alleged claim is of dubious merit. Copyright holders, the authors explain, have larger potential upsides and smaller downside risks to filing suit, since if they win they obtain damages but if they lose they don't have to pay damages (although a loss, especially if recorded in a published opinion as in this case, may make it more difficult for them to play their extortionate game in future cases). So copiers or alleged copiers may be "induced into licensing [that is, paying a fee for a license to reproduce] the underlying work, even if this license is unnecessary or conveys non-existent rights." *Id*. at 345. Depoorter and Walker (id. at 345 n. 172) give the example of the Summy-Brichard Company, a subsidiary of Warner Music Group, which "receives approximately $2 million per year in royalty payments for licenses to the song 'Happy Birthday to You,' despite the fact that the song is most likely in the public domain," as argued in Robert Brauneis, "Copyright and the World's Most Popular Song," 56 J. Copyright Society U.S.A. 335, 338-40 (2009).

*Id*.

### 1. KING IS A PREVAILING PARTY DESERVING OF ATTORNEYS' FEES.

A district court's equitable discretion to award attorney's fees to a prevailing party under § 505 is to be exercised in an evenhanded manner by considering factors such as whether the (a) lawsuit was frivolous or unreasonable, (b) the losing litigant's motivations, (c) the need in a particular case to compensate or deter, (d) the purposes of the Copyright Act, (e) and the novelty of legal issues involved. *Pearson Educ., Inc. v. Almgren*, 685 F.3d 691, 696 (8th Cir. 2012); *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1014 (8th Cir. 2006) (citing *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 534 & n.19 (1994)).

### a. GRINER'S LITIGATION WAS MANIFESTLY UNREASONABLE

Multiple times during this litigation, Appellants expressly stated that Griner's copyright infringement claim, or rather the *prima facie* case, was not frivolous. However, Defendants' made no secret that Griner's lawsuit was a publicity stunt and unreasonable in light of the damages sought, and all harm was self-inflicted. The Eighth Circuit directly addressed "spare-no-expense" litigation in concert with minimal damages. *Pearson*, 685 F.3d at 696.

In the present case, Griner achieved what this Court hinted that the *Pearson* defendant should have done; ask for the infringement to stop. It worked. After Griner

asked that the Committee cease any further use of the Work, it did. Griner and Sam could not point to a single indication of damage, and their damage proffers were objectively lame. Moreover, the settlement requests were shockingly unreasonable. Griner hoped that King would buy his way out of litigation, and she was wrong.

### b. KING FOR CONGRESS'S MOTIVATIONS

There are multiple motivations manifested and demonstrated by the Committee that ought to be considered by this Court. Motivations may be considered in a handful of perspectives; for example, the use of the copyrighted work and remediation strategy.

The Committee's use was indirect and ignorant of any infringement; and jury agreed. While the statutes and jury assign copyright culpability to the Committee, they also permitted and attributed to it innocence. Any "motivation" to infringe was born of a desire to reach voters in a shrinking handful of venues available to conservatives. In doing so, a third party utilized one of the most popular, current Internet fads, meme-ing; and in doing so utilized one of the top-ten Internet memes. The Meme was universally available on IMP sites throughout the Internet and the owner publicly aided and countenanced uses of the meme – all while purposefully refraining from removing the copyright material from the IMP websites. While 'being one of many' is rarely a successful defense to unlawful activity, it can have a place in discerning motivation.

Griner complains that the Committee pursued no license. King explained on the witness stand: Griner's demands seemed like a political stunt; the rapidity and universality with which news stories arose made Griner's initial demands seemed superficial (and the jury implicitly decided that they were). App.1301-03(Vol.3)/R.Doc.145, at 822-24. King, a veteran politician, could not marshal such a bevy of media sources. Appellants ask this Court to have some sympathy for King's inability to differentiate a well-orchestrated political stunt with a finely-honed publicity machine in real-time, notwithstanding that the latter seems more evident. Until a complaint found its way to King for Congress *a year later*, all signs indicated that he was correct; and even then it was hard to untangle the politics from the stunt.

### c. THE NEED IN A PARTICULAR CASE TO COMPENSATE OR DETER

If there is such a creature as a "model infringer," the Committee would be it. The Committee did not know about its own infringing actions, which were initiated by a third party. The website on which it was posted was not owned or controlled by them; the immediate apology; the complete absence of discernable harm based on the Post; etc. Sam claimed not only a lack of knowledge of the incident, but also of the litigation to enforce his own rights. The alleged ill-gotten-gains of King for Congress: $28.92 *or less*.

Objectively, Griner's rights were questionable. Law Reviews from Harvard and Georgetown weighed in to offer perspective and why Defendants may have been

right, and Georgetown explicitly cited Griner's case as an example of overbroad litigation. Cathay Y. N. Smith. Weaponizing Copyright. Harvard Journal of Law & Technology, Volume 35, Number 1 (Fall 2021); Cathay Y. N. Smith & Stacey Lantagne, Copyright & Memes: The Fight for Success Kid. Vol 110, (Fall 2021). Appellants never attempted to feign innocence concerning their actions; they handed over discovery documents immediately – unlike Appellees who were lobbing belated documents to Appellants two months after the close of discovery. Defendants never attempted to obfuscate the record with pointless denials of the *prima facie* case of copyright infringement, but rather focused the Court's attention to their meritorious defenses. Appellants attempted to settle with Appellees multiple times, and only failed to do so when Plaintiffs maintained their request for a settlement almost twice the statutory maximum for non-willful infringement. Accordingly, Defendants issued a Rule 68 offer for the median of the statutory maximum, $15,000.00, which Griner spurned. Afterwards, Griner used a damages witness as a mouthpiece with pre-packaged opinions and bases. App.1231-35(Vol.3)/R.Doc.144, at 229-232.

> Q: How did you choose [the handful of contracts on which to base your damage estimates]?
> A: I didn't choose them.

The Committee's blameworthiness is as close-to-zero as can be achieved without being innocent. This *femto*guilt is demonstrated qualitatively by its actions, and quantitatively in the jury award.

**d. THE PURPOSES OF THE COPYRIGHT ACT**

The purpose of the Copyright Act is hardwired into the Constitution: "[The Congress shall have Power . . . ] To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *U.S. Constitution*, Article I, Sect. 8, Clause 8. The Supreme Court explained:

> Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability to literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an "author's" creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

Photographs are meaningful, and are just as much a part of the "sciences" as other forms of creativity. There is a place for the creativity of Griner, or more specifically Sam. Griner is not a model of creativity that needs to be specially protected. The Success Kid image is a product of happenstance; and the notoriety is based entirely on Sam's efforts. Griner did not drive the phenomenon, she went along for the ride. If Laney Griner drove anything, it was the monetization and publicity. And when her confederates dangled the potential heroine-ship inherent in battling

perpetual media antagonist King, she showed what happens when the driven get taken for a ride.

There is a place for happenstance in Copyright; but the idea that an industry is helped by encouraging lawsuits of this kind is silly. The only beneficial aspect of this litigation is the successful defense against a troll like Griner. Harvard and Georgetown law reviews agree.

### e. NOVELTY OF ISSUES

Griner disparaged the Appellants' gung-ho attitude towards its defense. They had significant reason to fight. So much of this litigation has been based in doctrine only lightly touched in this Circuit, and elsewhere. When law reviews from Harvard and Georgetown shined a light on this case, it was not Appellees' tactics that were of interest to commentators, but King's. The caselaw concerning implied licenses is changing based on Internet transactions. Immodestly, when such institutions such as Harvard and Georgetown cheer on King, anyone having life experience ought to understand that there is a highly significant principle at stake – a principle that transcends traditional university bias.

## VIII. APPELLANTS DESERVED A PRIVILEGE LOG AND CLARK AS A WITNESS SHOULD NOT HAVE TESTIFIED.

*Standard of Review:* Exclusion orders, or their non-existence, are considered under an abuse of discretion standard. *See Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010).

The district court issued a series of evidentiary rulings at the pre-trial hearing stage that significantly harmed the Appellants' capacity to prepare for trial. App.62-63(Vol.1)/R.Doc.116, at 4-5/Add.69-70. There was not a single discovery request related to damages that Appellees did not try to thwart with an objection to attorney-client privilege and reference to not-yet-due expert testimony. When one week after the close of discovery, Appellees altered their Rule 26 disclosures to feature two new witnesses, an attorney Kia Kamran and Sam's entertainment agent, Ben Clark, and two months after the discovery closure, doubled their document disclosures; Appellants warned the district court that something was amiss. The logic was simple: Appellees obfuscated the record with expert and attorney-client privilege objections, they tendered no damage documents, and subsequent to discovery's close, an attorney and an agent appeared.

When challenged *in limine*, Appellees withdrew the attorney as a witness, but maintained Clark, and the district court approved. "The disclosure mandates in Fed. R. Civ. P. 26 are given teeth by the threat of sanctions in Fed. R. Civ. P. 37. Rule 37(c)(1) provides that when a party fails to comply with the disclosure requirements in Rule 26(a), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 699 (8th Cir. 2018).

Every word Clark uttered in court was undisclosed in discovery – because he was undisclosed. Although Appellees claimed that he was not tendered as an expert witness, he testified as to the amount of license fees that would be awarded as damages based on a political use of the Meme. Appellants 700-series objections were overruled. Clark should have been disallowed at the pre-trial hearings. Nevertheless, it was perhaps harmless error; Appellees sensed that his testimony was lame, and quickly opted for statutory damages – for which they received the minimum.

Of more interest is the privilege log. App.944-45(Vol.3)/R.Doc.99-2, at 6-7 (See n.2). Appellees were perhaps cynical enough to believe that Appellants thought that approximately twenty corporate media outlets all wrote the same story at the same time using the same quotes. Appellants asked Appellees in discovery for their media outreach documents and targets and received no answers or documents. One document, however, appeared in Appellees' trial exhibits: the email where Griner's publicity team is compiling a list of media outlets that ran Griner's press release (which Appellants also never received). When Appellants confronted Griner with her own exhibit; counsel for Griner immediately objected on the basis of attorney-client privilege. A document compiling correspondences to news outlets sent through an attorney[14] (that provided no legal advice) was deemed privileged by the court.

---

[14] Even for the sake of argument if this email were protected by privilege, the underlying communications from Griner's publicity team to journalists would not be. These communications were copied and forwarded in the email.

This was wrong, and it is clear that Appellees were laundering harmful information though privilege. This Court should order that Appellees create the privilege log that Magistrate Judge Roberts ordered Appellees to tender, which they did not, and the court chose not to enforce *in limine*.

## IX.   APPELLANTS' EXCLUDED EVIDENCE WAS PREJUDICIAL, BUT NOT UNFAIRLY SO

*Standard of Review:* This Court considers such rulings for abuse of discretion. *U.S. v. Gilbert*, 721 F.3d 1000, 1005 (8th Cir. 2013).

The court excluded Appellants' evidence of inflammatory and political statements under FRE 403 in the pre-trial order and during trial. A blanket rule issued that prohibited evidence of: (i) any political nature Griner associated with the Meme, and (ii) non-licensed distasteful uses of the Meme by Griner. A zeroth rule of the Internet is that one can find exactly what one seeks, however disgusting and bizarre. Appellants never descended to this depth. *Every Meme or commentary* that Appellants advanced as evidence originated from Griner from one of her Success Kid public social media accounts. These items were relevant, and although prejudicial, were not unfairly so. *U.S. v. Worthey*, 716 F.3d 1107, 1114 (8th Cir. 2013).

### A. POLITICS

The court went to great lengths to omit politics from the case. App.53-55(Vol.1)/R.Doc.109, at 9-11/Add.60-62.  A sensible rule, but this case probably

called for the exception. App.953-60(Vol.3)/Doc.101, at 4-11.[15] Appellants were never attempting to have the battle supposed by the court of liberalism v. conservatism. The court would credit neither Defendants argument, nor oddly, its basis, after repeatedly having been told. App.1186-91(Vol.3)/R.Doc.143, at 192-96. Appellants repeatedly explained in motion-after-motion, in no uncertain terms that the significance of the political evidence was twofold: (i) Griner dangled every conservative trope and conspiracy theory before corporate media in order to gain attention that she would later decry as damaging, and (ii) Griner's multiple injections of the Success Kid brand into politics undercut his assertions that King's political use of the Meme had tarnished the brand. Griner, in her complaint, tangentially referred to King as a white nationalist and abhorrent, and stated that she brought the suit in order to halt any association of King's bigotry, support for rape, support for incest, etc. with the Success Kid brand. Interestingly, Griner does not seem to know much about King; evidence tends to show that she does not really have any opinion about King – but she sure recognized corporate media's dislike for him. Appellants never meant to show that Griner is a liberal, but rather that she is an attention-seeker wearing liberalism like a cloak. App.(Vol.3)963-997/R.Doc.101-1, 2-36. She got that attention and feigned outrage. The jury should have been made aware.

---

[15] Note that here, Appellants provide the justification that court said was lacking in the later ruling.

When Griner repeatedly publicly referred to King as a racist, and worried that his taint would stain Success Kid, a jury could have logically concluded any prejudice could have derived from her injection of the Meme into certain political actions. One of Griner's more notorious uses was giving the Obama administration permission to use the Meme publicly in support of a 2014 immigration bill.[16] Although a large part of America sees immigration bills as a means for combatting racism, an equally sizable portion of America sees the exploitation of Mexican and Central Americans as racism. More significantly, the funding for the notorious 'child cages' used by Dept. of Homeland Security was first authorized in that bill, and plenty of America was savvy enough to know. So when national newspapers associated that bill with Success Kid, any racist taint could fairly be attributed to sources other than King.

Finally, the court excluded associations of Pepe the Frog avatars with Griner and Success Kid. Pepe the Frog is a notorious emblem of the alt-right, spawned on 4chan (an alt-right Internet hangout) and frequently associated with racist and bigoted memes. The court recognized that, and omitted any exhibit with Pepe. App. 52-53(Vol.1)/R.Doc.109, at 7-8/Add.59-60. This would be quite sensible except for

---

[16] Again, in the spirit of politics-neutral litigation, the significance isn't simply based on leftist policy, but rather that Griner is an opportunist: *she didn't read the bill with which she associated her son and the Brand*. App.759-80(Vol.2)/R.Doc.80-1 at 228-229.

one catch. When Griner auctioned off the original photograph for the Work as a non-Fungible Token (i.e., as a file, not as intellectual property) on the Internet, the winning bidder was an anonymous purchaser displaying a Pepe avatar. There was Sam's original beach image adjacent to a bidder with a Pepe avatar for all the world to see with a winning bid[17] in the tens of thousands of dollars (the bid was in bitcoins), publicized throughout the Internet and through the Success Kid fanpage that Griner maintained. Appellants were not any more eager to associate Griner with the alt-right than with leftism. The significance isn't Griner's particular political philosophy, but rather the jury deserved to see that she is an opportunist – and any taint of racism, once again, could originate from a source other than King. App.952-53(Vol.3)/R.Doc.101, at 3-4. Given the right opportunity Griner would associate her son with Pepe; this makes indignation concerning King's use considerably less believable. Had this Exhibit E5 been allowed, it would have been identical to App.171-75(Vol.1)/R.Doc.43-3, at 60-64.

<u>Illustration No. 4 ("The Winning Bid")</u>



Auction won by @a
**Sold for 15.00 ETH** $38,169.45
Apr 10, 2021 at 10:15pm

Auction settled by @successkid ⧉

---

[17] Also, the auction and its publicity coincided with the filing of this lawsuit.

## B. DISTASTEFUL USES

The court concluded evidence concerning the alleged wholesomeness of the brand would only be subject to moderate challenge unless there was a license tied to it. For example, Appellants were able to proffer evidence of the television contract whereby a network acquired the right to use the Meme on a television show along with the phrase "She want the D#&$"[18] (referring to an interaction with a female character). This phrase was written into the contract. App.1245-48(Vol.3)/R.Doc.144, at 471-73. Also, evidence of a contract that allowed Music Television (i.e., MTV) Latin America to display the Meme for unspecified uses had its own power. Testimony was that neither the agent nor Griner recalled checking on the use of the Meme to ensure that MTV Latin America was using the Meme in a wholesome context. App.1201-09(Vol.3)/R.Doc. at 144, 363-69. (Success Kid brand using the "I'm gonna' F you up" meme).

The district court's requirement that distasteful uses of the Meme by Griner on the Success Kid social media platforms and fan page were inadmissible if not subject to a license was largely arbitrary.[19] App.1245-54(Vol.3)/R.Doc.145, at 274-

---

[18] Male Genitalia.

[19] Said the judge: "She's not authorized somebody else to use it. She's not sold it to somebody else. She's not made money off of some other political candidate." App1254(Vol.3)/R.Doc.144, at 282. Any parent of teenagers knows: the difference

82. Whatever gains were gained by the court in terms of decorum and time were strongly outweighed by the significance of negative brand effects. Brands are not simply what a brand source pays for the public to see, but a mixture of everything seen by the public; right now *Bud Light* and *Target* are learning that no amount of paid, corrective publicity can make up for misplaced, offensive public gestures. Again, Appellants are not dragging detritus from the four corners of the Internet to confront Griner; every exhibit (except the free-standing Pepe series) is a Meme or use of Success Kid that Griner commented upon or distributed using her SuccessKid (or #SuccessMom) social media credentials publicly.

- The marijuana Success Kid Memes are displayed by Griner and fan page that she maintains for the Success Kid brand; App.491-95(Vol.2)/R.Doc.70-2, at 44-48(Ex.E17,18)*; App.1295-1300(Vol.3)/R.Doc.145, at 140-144 (Ex.E17, 18)*; App.836-843(Vol.2)/R.Doc.80-2, at 305-9

- The masturbation Meme is on that same fan page; App.491-95(Vol.2)/R.Doc.70-2, at 44-47; App.1295-1300(Vol.3)/R.Doc.145, at 140-144 (Ex.E18)

———————————

between what one tolerates and what one fosters is slight. Brands are re-learning this.

Griner and her business agent in court expressed shock that a third party used her 'baby' in connection with beer. App.1192-95(Vol.3)/R.Doc.144, at 43-45; App.1214-16(Vol.3)/R.Doc.144, at 211-12. This charade could only be perpetrated secure in the knowledge that a court is shielding Griner from the brand's more glaring defects. App.1292-94(Vol.3)/R.Doc.145, at 121-22.

## C. CONCLUSION

This Court should allow such evidence and consider it in light of an award of attorneys' fees, or remand with instructions to consider such evidence in the determination of an attorneys' fee award. The district court excluded political evidence and salacious evidence; and the Appellees' felt comfortable claiming that thei brand was apolitical and wholesome. This Brand was never wholesome, and Griner does not have anywhere near the standards that she claims.

## X. COSTS

Rather than claim "copy fees" the undersigned did something more unusual. I drove from Washington D.C. to Western Iowa taking all of my home office equipment. New York, D.C., Boston, Chicago (and even Northern Virginia) are awash with late-night copy centers. When I discovered that Sioux City, IA had only one copy shop, it reinforced my idea. Luckily, I did. My local trial counsel, a sole-practitioner, was hospitalized the day before trial, and the physical documents that I thought that he would bring, I had to manage. Everything turned out well; my

generous client shook his head when he saw my Spartan hotel, and acquired for me a luxury office suite, and I went through a significant amount of ink in the wee morning hours. As I showed the court, if I had to rely on a copy center, it would have been closed, and much, much more expensive. When the time came to recover copy fees, I submitted receipts for my ink. Not only was the plaintiff unimpressed, but the court denied me this seeming courtesy to opposing counsel. App.95(Vol.1)/R.Doc.161, at 24; App.1291-92(Vol.3)/R.Doc.157, at 6-7 (links to costs in single Sioux City *Fedex* copy center and its hours).

## CONCLUSION

This case is an unorthodox mixture of new issues, frontier legal issues, and a sensible trial judge attempting to avoid any aspect of politics or unusual actions. However, this case became political the moment that Griner realized that inflammatory political language would gain her and her brand publicity, and the evasive discovery antics of the plaintiffs – who seemingly never considered the possibility of a trial – called for unusual remedies. Appellees gamed the system, and exploited the moderate inclinations of district court, all to the detriment of Appellants.

Respectfully submitted,

By *M. Keith Blankenship*
M. Keith Blankenship, Esq.
Attorney for Applicant
VSB# 70027
Da Vinci's Notebook, LLC
9000 Mike Garcia
No. 52
Manassas, VA 20109
703-581-9562
keith@dnotebook.com

With him on the brief

Maj. Sean Chao
A 3rd Year Law Student at
District of Columbia Law School

SHUCK LAW FIRM, P.C.

/s/ Daniel B. Shuck
DANIEL B. SHUCK     AT0007141
Shuck Law Firm
501 Pierce Street, Suite 205
Sioux City, Iowa   51101
Telephone:     (712) 258-0121
E-mail:  Dan.Shuck@shucklawfirm.com
ATTORNEY FOR DEFENDANTS,
STEVEN ARNOLD KING and KING FOR
CONGRESS

CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing instrument was served upon all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of records herein on the **2nd** day of _____August_____, **2023**, by:

| | | | |
|---|---|---|---|
| ☐ | U.S. Mail | ☐ | FAX |
| ☐ | Hand Delivered | ☐ | UPS |
| ☐ | Federal Express | ■ | E-mail via CM/ECF |

/s/ Kim Shuck

# <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B), because: this brief contains less than 13,000 words, and exactly 12,446 words, excluding the parts of the brief exempted.



2. This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

3. This brief has been scanned for viruses and the brief is virus-free.

Dated: August 2, 2023

Respectfully Submitted

By:

M. Keith Blankenship
Counsel of Record
Da Vinci's Notebook, LLC
9000 Mike Garcia Dr.
No. 52
Manassas, VA 20136
703-581-9562
keith@dnotebook.com